UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
P.C. and K.C., individually and on behalf of student A.C.,

                                    Plaintiffs,

                                                              **OPINION AND ORDER**

                - against -
                                                               No. 15-CV-6006 (CS)

RYE CITY SCHOOL DISTRICT,

                                    Defendant.
------------------------------------------------------------------------x

<u>Appearances</u>:
Gerry McMahon
The Law Offices of Gerry McMahon, LLC
Danbury, Connecticut
*Counsel for Plaintiffs*

Susan Gibson
Ingerman Smith, LLP
Hauppauge, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

        Before the Court are Plaintiffs' Motion for Summary Judgment, (Doc. 18), and

Defendant's Cross-Motion for Summary Judgment, (Doc. 20).  Plaintiffs P.C. and K.C. ("PC

and "KC," or the "parents") bring this action on behalf of their child, A.C. ("AC"), pursuant to

the Individuals with Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. §§ 1401 *et

seq.*;[1] Article 89 of the New York State Education Law; and Part 200 of the Regulations of the

Commissioner of Education against Defendant Rye City School District (the "District").

---

[1] The Individuals with Disabilities Education Act ("IDEA") was amended in 2004 by the IDEIA.  All references to and cases cited herein discussing the IDEA remain authoritative.

Plaintiffs seek review of an administrative decision by a State Review Officer ("SRO") at the

New York State Education Department ("NYSED") affirming the decision of an Impartial

Hearing Officer ("IHO").  The IHO found that:  (1) the District did not deny AC a Free and

Appropriate Public Education ("FAPE") during the 2010-11, 2011-12 and 2012-13 school years

because its in-district school recommendation for 2010-11 and 2011-12, the Midland Elementary

School ("Midland"), and its out-of-district school recommendation in 2012-13, the Board of

Cooperative Educational Services ("BOCES") Gifted Program at Irvington ("Irvington"), were

sufficient to meet AC's educational needs; (2) the private school – Eagle Hill School ("Eagle

Hill") in Greenwich, Connecticut – at which AC's parents placed him for those school years was

not an appropriate placement; (3) equitable considerations did not support the parents' claim for

reimbursement for the 2010-11 school year because the parents did not give the District adequate

notice of their intention to request reimbursement for an out-of-district placement for AC, but did

support the parents' claim for reimbursement for the 2011-12 and 2012-13 school years because

at those times the parents did give adequate notice;[2] and (4) the District was not required to

reimburse the parents for the costs of tuition at Eagle Hill for any of the three years.  (IHO

Decision 118-19.)[3]

---

[2] The IHO's findings are somewhat imprecise on this issue.  The IHO decision initially suggests that the parents provided insufficient notice for the 2010-11 school year because they told the District that their son would be attending a private placement for the upcoming school year but did not indicate that they would be seeking reimbursement for those costs.  (Declaration of Susan M. Gibson in Support of Defendant's Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment ("Gibson Decl."), (Doc. 22), Ex. 1 (Decision of IHO Paul T. Bumbalo, dated May 5, 2014 ("IHO Decision")), at 102-03.)  The IHO's final findings, however, state that the parents provided proper notice in each of the three school years.  (*Id.* at 118 ¶ 7.)

[3] The IHO decision forms part of the administrative record, a certified hard copy of which was sent to the Court on November 5, 2015.  The exhibits cited herein also form part of the administrative record presented to the SRO and filed under seal.  Defendant's exhibits are referred to here as "Dist. Ex. [exhibit number]."  Plaintiffs' exhibits are referred to here as "Ps' Ex. [exhibit number]."  The complete list of exhibits is part of the record that was submitted to the SRO.  The transcript from the hearing before the IHO, also part of the record submitted to the SRO, is cited herein as "Tr. [page number]."

The SRO dismissed Plaintiffs' appeal in its entirety, finding that the evidence in the record supported the IHO's determination that the District offered AC a FAPE for the 2010-11, 2011-12 and 2012-13 school years. The SRO did not reach the issues of whether Eagle Hill constituted an appropriate unilateral placement or whether equitable considerations supported the parents' claim. (SRO Decision 21.)[4]

Plaintiffs seek an order reversing the IHO and SRO decisions as erroneous and awarding Plaintiffs tuition reimbursement for the 2010-11, 2011-12 and 2012-13 school years, among other things. (Compl. at 21-22.)[5] Defendant seeks an order upholding the SRO's decision in its entirety and dismissing Plaintiffs' Complaint. (D's Mem. 1.)[6] For the reasons set forth below, Plaintiffs' Motion for Summary Judgment is DENIED and Defendant's Cross-Motion for Summary Judgment is GRANTED.

## I.    Background

### A.    Facts

The following facts are undisputed unless otherwise noted.

AC attended schools within the District through the 2009-10 (second grade) school year. In that time, he received educational services in a general education setting at Midland. (SRO Decision 3.) For part of first grade and all of second grade, AC operated under a plan established pursuant to Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 794. (*Id.* at 2-3.) This plan was created because AC was diagnosed with attention deficit hyperactivity disorder, a developmental coordination disorder, and sensory integration

---

[4] "SRO Decision" refers to the Decision of SRO Justyn P. Bates, dated March 30, 2015. (Gibson Decl. Ex. 2.) This document, like the IHO Decision, forms part of the administrative record.

[5] "Compl." refers to Plaintiffs' Complaint, filed July 31, 2015. (Doc. 6.)

[6] "D's Mem." refers to Memorandum of Law in Support of Defendant's Cross-Motion for Summary Judgment. (Doc. 21.)

dysfunction.  (*Id.*; *see* Dist. Ex. 3, at 1.)  AC was first classified as a student with a disability on

January 15, 2009, during a meeting of the local Committee on Special Education ("CSE") –

comprised of parents, teachers, a school psychologist and a district representative – which

convened because AC was a student eligible for special education services.  (*See* Dist. Ex. 3, at

1, 4.)  The CSE was responsible for working with AC and his parents to develop an

Individualized Education Program ("IEP") that set forth his social, emotional and educational

needs and goals.  *See* 20 U.S.C. § 1414(d)(1)(A)-(B); 34 C.F.R. §§ 300.320-21; N.Y. Educ. Law

§ 4402; 8 N.Y.C.R.R. §§ 200.3, 200.4(d)(2).  AC had been referred to the CSE on November 12,

2008.  (*See* Dist. Ex. 32.)

   During the January 15, 2009 meeting, the CSE discussed AC's program and placement

for the remainder of the 2008-09 (first grade) school year.  Among other things, the CSE

concluded that occupational therapy would address AC's motor weaknesses and help him

become more independent and self-sufficient.  (*See* Dist. Ex. 3, at 1-2.)  It recommended that he

continue learning in a general education setting but that he also receive weekly occupational

therapy on both a 1:1 and 3:1 basis, as well as monthly psychological and speech/language

consultations.  (*Id.* at 1.)

   The CSE reconvened on May 4, 2009 and found that AC's "present cognitive abilities

and academic levels [were] meeting both grade- and age-level expectations," and that he had

"demonstrated growth in all academic areas" since the beginning of his first grade year and since

the prior CSE evaluation.  (Dist. Ex. 4, at 3.)  Nonetheless, the CSE further stated that AC

remained highly anxious and continued to experience difficulties navigating his environment,

focusing on tasks and following directions.  (*Id.*)  It further stated that AC would need additional

modifications to his academic program and goals to be successful.  (*Id.* at 6.)  The CSE therefore

4

recommended two weekly sessions with a resource consultant teacher, additional counseling, and a daily shadow aide as part of his IEP for the 2009-10 school year, in addition to the related services the CSE was already providing.  (*Id.*)

The CSE next met on May 3, 2010 to review AC's progress and develop his IEP for the 2010-11 school year.  The CSE found that AC was struggling to initiate and sustain work in all academic areas, and that mathematics in particular posed the greatest challenges.  (Dist. Ex. 5, at 4.)  It noted, however, that AC also exhibited strengths in reading with intonation, explicit comprehension skills, spelling and creative writing.  (*Id.*)  With respect to interpersonal skills, the CSE found that AC still experienced anxiety over social interactions and continued to struggle to develop quality relationships with peers within the classroom.  (*Id.* at 5.)  The CSE maintained many of the same services offered during the 2009-10 IEP, but recommended enhancements to nearly all of them.  For instance, it increased AC's 1:1 sessions with the resource consultant teacher to five times a week, rather than two; increased the monthly occupational therapy and speech/language therapy consultations to sixty minutes, rather than thirty; it doubled AC's weekly counseling; and offered support by a teaching assistant ("TA") on a 1:1 basis, rather than 3:1, for the duration of the school day.  (*Id.* at 7.)  The CSE further recommended a new hourly consultation on a monthly basis with the resource consultant teacher. (*Id.*)  The CSE felt that these enhanced services would support AC's academic and social growth and help him manage his anxiety throughout the school day and within the general education environment.  (*Id.*)

On June 4, 2010, AC was accepted at Eagle Hill for the 2010-11 school year.  (*See* Dist. Ex. 33.)  On June 10, 2010, the parents submitted an application to the District for transportation,

which noted that AC would be attending Eagle Hill beginning on September 10, 2010.  (*See* Dist. Ex. 34.)

The CSE reconvened on May 13, 2011.  At that meeting, KC stated that AC had become less anxious during the past year at Eagle Hill, and as a result had gained confidence and focus. (Dist. Ex. 6, at 2.)  Eagle's Hill's educational director and guidance counselor also stated that the transition was very difficult for AC, but that his social skills, reading comprehension, and certain functioning skills had improved.  (*Id.*)  KC expressed her belief that if AC were to return to Midland School for the 2011-12 school year, his anxiety would increase and he would again become overwhelmed.  (*Id.*)  After reviewing at length AC's academic, physical and social development over the past year, the CSE recommended the same offerings for the 2011-12 school year as it had for the 2010-11 school year, based on its belief that the resource consultant teacher, speech/language therapy and 1:1 TA were still necessary to bolster AC's academic engagement, that the psychological counseling would aid his anxiety and social development, and that the occupational therapy would address his motor and sensory skills.  (*Id.* at 5-7.)

On August 14, 2011, the parents wrote a letter to Dr. Anat Mor, the school psychologist at Midland, explaining that while they appreciated all of the services that the District had provided to AC, and despite "the excellent IEP that was created and implemented for him," they felt Midland was not appropriate due to the "amazing success" AC experienced at Eagle Hill. (Dist. Ex. 36, at 1.)  The parents further noted that Midland's offerings in its 2010-11 IEP had been "very similar" to what Eagle Hill offered, but suggested that they had "had no other choice but to enroll" AC at Eagle Hill for the previous school year because its small size provided a less overwhelming environment and its students complete their homework at school before going home, which the parents believed would reduce burdens on them – an apparently important

6

consideration given KC's breast cancer diagnosis in late spring 2010 and ensuing treatment

cycle.  (*See id.* at 2.)  The parents' letter confirmed that they would re-enroll AC at Eagle Hill for

the upcoming 2011-12 school year and requested that the District consider sharing the cost of

tuition.  (*Id.* at 3.)[7]

The CSE next met on May 21, 2012 to review AC's recent reevaluations and recommend

support services for the 2012-13 school year.  KC stated that AC's anxiety and functioning

difficulties decreased after his second year at Eagle Hill, and that his social and pragmatic skills

improved.  (Dist. Ex. 7, at 2.)  The CSE reviewed the results of AC's psychological evaluation,

which revealed test scores that had decreased since 2009.  The CSE noted that visual processing

---

[7] The parents' letter also suggested that the District had offered to enroll AC at the BOCES program at Pocantico Hills, an out-of-district placement, for the 2011-12 school year.  (*See* Dist. Ex. 36, at 1.)  There appears to have been some confusion as to whether the District attempted to obtain a placement at this program.  Shortly after the CSE met and developed the IEP for the 2011-12 school year on May 13, 2011, the parents met informally with Dr. Mor and Shirley Klein, the District's director of pupil personnel services.  (SRO Decision 15; *see* Tr. 281.)  According to Dr. Mor's and Klein's testimony, KC asked Klein at this meeting if the District could share the expense of Eagle Hill's tuition, to which Klein replied that the District could not help pay for a program at a school that is not state-approved, but that the CSE could potentially look at similar programs, featuring small, self-contained classrooms, if necessary.  (Tr. 282-83; 679-80.)  Dr. Mor recalled that KC therefore asked to see what state-approved programs existed.  (Tr. 283-84.)

Dr. Mor indicated that typically when a CSE searches for an out-of-district program, it seeks parents' consent to distribute information to various programs, who then review that information and determine if they are interested and if they would suit the child's needs.  (Tr. 285.)  She testified that in this instance this process did not occur and that the CSE that year – in its 2011-12 IEP or otherwise – did not recommend undergoing these steps or seeking out any out-of-district placements for the upcoming school year.  Nevertheless, it appears that the parents consented to the District sending AC's information to the BOCES program at Pocantico Hills, (Ps' Ex. 17), although, according to Klein, this release was not what the District ordinarily would use when seeking out other placements; rather, it was merely intended to allow the exchange of information in order to facilitate the upcoming visit, (Tr. 686).  The parents, along with Dr. Mor, proceeded to observe a class at Pocantico Hills.  (Tr. 289, 687.)  Dr. Mor testified that she understood the visit to be intended to identify programs "that could potentially be an appropriate fit for a child if the CSE determined that it was necessary," but the CSE made no such recommendation.  (Tr. 290; *see* Tr. 690-91.)  Indeed, neither the IEP nor any other documentation in the record reflects a recommendation by the CSE to pursue Pocantico Hills or another out-of-district placement for the 2011-12 school year.

After the visit, Pocantico Hills sent a letter on June 24, 2011 to Klein indicating that AC had been accepted by the program.  (Ps' Ex. 17, at 4.)  The District's version of events is clouded by its failure to explain this letter.  Klein testified that she did not know why Pocantico Hills sent the parents an acceptance letter, given her position that the District had not sought out or inquired about a formal placement.  (Tr. 687-89.)  Conversely, Plaintiffs maintain that the District in fact did offer AC an out-of-district placement.  They point to, for instance, an email titled "[AC] Intake," sent before the parents' visit, in which the BOCES supervisor of special services wrote that he and Klein "discussed the possibility of [a particular] class" for AC.  (Ps' Ex. 72, at 4.)  The parties agree, however, that the parents found the Pocantico Hills program unacceptable.  (Tr. 292-93, 297, 552-53, 2246-47.)

and visual perception remained areas of "significant weakness," although it felt that AC's IQ

results, as measured by the Wechsler Intelligence Scale for Children test – also known as WIAT

– underestimated his true cognitive potential.  (*Id.*)  The CSE further reviewed other test scores

indicating deficiencies in basic mathematics principles and reasoning abilities, as well as

decreased motor coordination and motor integration abilities.  (*Id.*)  The CSE agreed to explore

out-of-district programs for the upcoming school year and reconvene later that summer.  (*Id.* at

3.)  In the interim, the CSE recommended that AC would benefit from extended school year

support, which would last from July 2, 2012 until August 10, 2012 and provide AC with weekly

occupational therapy as well as a 15:1 classroom environment.  (*See id.* at 1, 3.)

The CSE reconvened on July 12, 2012.  By this time, it had circulated AC's information

to several public school programs in the District as well as to out-of-district placements such as

the Summit School and the BOCES at Irvington.  (Dist. Ex. 8, at 2; *see generally* Ps' Ex. 18.)

Although the Summit School declined AC's placement, (Ps' Ex. 18, at 2), Irvington accepted AC

into the gifted program, invited the parents to visit and indicated that AC would be "a wonderful

addition" to their class.  (Dist. Ex. 8, at 2.)  The CSE agreed and recommended that AC attend

Irvington, which would offer occupational therapy, speech/language therapy and counseling – as

the CSE's prior IEPs had – as well as place AC in a 12:1+1 class setting.  (*Id.*)  The parents,

however, rejected the program based on the profile of the other students who would be in AC's

class.  In particular, they stated that the other students would be younger than AC, would have

significantly higher IQs than AC, and would have disability classifications that did not match

AC's – for instance, other admitted students were classified as Emotionally Disturbed, Autistic,

or Other Health Impaired, (*id.* at 2-3), whereas the CSE at the May 21, 2012 meeting had

changed AC's classification from Other Health Impaired to Learning Disabled, (*see* Dist. Ex. 7,

at 3; *see also* SRO Decision 17).  The parents further expressed concerns regarding the additional transitions AC would need to make into new environments and the travel time to and from Irvington.  (Dist. Ex. 8, at 3.)  Accordingly, they indicated their intent to place AC at Eagle Hill for the 2012-13 school year and request reimbursement for tuition and related expenses.

B. <u>Procedural History</u>

1. <u>Due Process Complaint</u>

AC's parents filed a due process complaint on January 17, 2013.  (*See* Dist. Ex. 1.)  The parents alleged that the District failed to offer AC a FAPE for the 2010-11, 2011-12 and 2012-13 school years, in that it failed to:  (1) provide AC with a program that would adequately address his academic, social and emotional needs; (2) offer AC any alternative out-of-district program for the 2010-11 school year; and (3) offer AC appropriate out-of-district programs for the 2011-12 and 2012-13 school years.[8]  (*Id.* at 9-10.)  The parents also argued that their unilateral placement of AC at Eagle Hill was appropriate because Eagle Hill offered programming and related services designed to meet AC's unique needs and was the best environment for his anxiety and emotional well-being.  (*Id.* at 4-5.)  The parents sought an order from the IHO granting the following relief:  (1) reimbursement for tuition and related expenses for the cost of AC's placement at Eagle Hill for the 2010-11, 2011-12 and 2012-13 school years; (2) a determination that Eagle Hill is the Stay Put Placement for AC; and (3) attorneys' fees and costs. (*Id.* at 10.)

---

[8] As discussed previously, (*see supra* note 7), the District contests the notion that it offered AC an out-of-district placement at Pocantico Hills for the 2011-12 school year.

 2.    IHO Decision

On April 24, 2013, the IHO commenced a hearing, which concluded on February 12,

2014 after seventeen nonconsecutive days of testimony.  In his decision, issued May 5, 2014,[9]

the IHO first found that the District's May 3, 2010 IEP, (Dist. Ex. 5), was reasonably calculated

to provide educational benefit and therefore provided AC with a FAPE for the 2010-11 school

year.  (IHO Decision 96-97, 100, 118.)  The IHO observed that leading into that year, AC

exhibited "slow and steady improvement" during the 2009-10 school year in certain key areas,

based on an annual review of the effectiveness of AC's occupational therapy, as well as on a

classroom benchmark assessment reflecting improvement in certain writing and math metrics.

(*Id.* at 99-100.)  The IHO therefore concluded that it was "hard to find that there was no

progress" made, (*id.* at 118), although the IHO noted continued difficulties in non-verbal

reasoning, anxiety and sensory issues, (*id.* at 98-100).  The IHO reviewed the proposed IEP,

noting that it recommended, among other things, resource consultant services five times a week

at a 1:1 ratio, counseling twice per week for thirty minutes, and a TA who would accompany AC

at lunch and recess to assist with social situations.  (*Id.* at 96-97.)  The IHO further noted that the

2010-11 IEP meaningfully increased the variety and quality of AC's individualized services.  (*Id.*

at 97.)

Next, the IHO found that Plaintiffs had not met their burden of showing the

appropriateness of AC's placement at Eagle Hill.  (*Id.* at 101.)  He first noted Plaintiffs' August

14, 2011 letter to the District "compar[ing] the district program [offered for the 2010-11 school

year] with the program at [Eagle Hill] somewhat similarly," and reasoned that Eagle Hill offered

---

[9] As discussed further below, the rambling, incomplete IHO Decision is, frankly, an embarrassment.  Counsel for
Defendant is directed to send a copy of this Opinion and Order and the IHO Decision to the NYSED official
responsible for certification of IHOs.

an academic advisor who served the same roles that the resource consultant and TA would have. (*Id.* at 100.)  The IHO found that placement at Eagle Hill was not suitable, however, because it did not provide an appropriate amount of occupational therapy services.  (*Id.* at 101.)  He also credited the testimony of Dr. Mor, who stated during the hearings that AC was progressing at a slower rate than other students due to the lack of exposure at Eagle Hill and because its program did not help him retain and grasp as much material as possible.  (*Id.*; *see id.* at 15.)

Finally, the IHO found that equitable considerations did not support reimbursing the parents because while there was evidence that they put the District on notice that AC would be attending a private placement, the notice did not request reimbursement, and therefore the District was disadvantaged because it was unable to review AC's program and placement prior to being potentially liable for the costs associated with the 2010-11 school year.  (*Id.* at 102-03.)[10]

Turning to the 2011-12 school year, the IHO noted that the District's recommended program remained substantially the same as the prior school year.  (*Id.* at 103.)  The IHO found that while the District provided extensive testimony about the importance of AC being involved with typically developing peers (and how its placement would facilitate this), Plaintiffs did not offer witnesses with firsthand familiarity with the Eagle Hill program that AC experienced.  (*Id.* at 105.)  The IHO further found that the District's academic programs were more rigorous than Eagle Hill's, and that the latter did not provide any occupational therapy from a certified therapist, provided insufficient motor training and restricted AC's access to typically developing peers.  (*Id.* at 106.)  With respect to equitable considerations, the IHO found that Plaintiffs gave sufficient notice to the District that AC would be attending Eagle Hill for the 2011-12 school

---

[10] As noted earlier, although this is the view most frequently expressed in the decision, the IHO's determination as to the equitable considerations regarding the 2010-11 school year is not entirely clear.

year and that they were seeking a monetary contribution toward the cost of tuition there.  (*Id.* at 108.)

Finally, turning to the 2012-13 school year, the IHO reviewed the District's recommendation that AC be placed in the BOCES gifted program at Irvington, (*id.* at 109), as well as Plaintiffs' argument that AC had made progress at Eagle Hill and that the Irvington program would require AC to undergo difficult transitions in an environment populated by students with higher cognitive abilities, (*id.* at 111).[11]  The IHO noted that the District's evaluations revealed decreased test results in math, writing, perception, motor and functioning skills, among other things, and opined that a smaller program such as Irvington's would help AC make gains in these areas.  (*Id.* at 110-11, 113.)  The IHO concluded that the District offered AC a FAPE, although his reasoning is not entirely clear.  (*Id.* at 116-17.)  With respect to equitable considerations, the IHO further concluded that the parents provided sufficient notice to the District as to their request for tuition reimbursement.  (*Id.*)

3.    SRO Decision

The parents appealed the IHO's denial of their request for reimbursement for AC's tuition costs at Eagle Hill for all three years at issue.  The District also cross-appealed the IHO's determination that Plaintiffs provided sufficient notice concerning unilateral placement for the 2010-11 school year.  (SRO Decision 1.)

On March 30, 2015, the SRO issued an opinion affirming the IHO and denying both appeals.  In doing so, the SRO performed a thorough examination of the record and of the IHO Decision.  (*Id.* at 2-6.)  Beginning with the 2010-11 school year, the parents first asserted that the

---

[11] The IHO's entire discussion regarding the appropriateness of the private placement for the 2012-13 school year, (*see* IHO Decision 114-15), is a repeat of his earlier review and analysis concerning earlier school years, (*see id.* at 100-01, 106-07).

IHO erred in concluding that AC showed progress during the 2009-09 and 2009-10 school years, which led the IHO to incorrectly find that the IEP offered for the 2010-11 school year was appropriate to meet AC's needs and offer him a FAPE. (*Id.* at 9-10.)  The SRO disagreed, finding that the IHO thoroughly considered evidence of academic testing and progress reports, including AC's progress report related to his 2009-10 IEP goals, (*see* Dist. Ex. 22), which suggested that AC "had achieved or was progressing toward the majority of the annual goals" for the 2009-10 school year, (SRO Decision 10).  Accordingly, while the SRO also acknowledged the deficiencies that AC exhibited during that year, (*id.* at 3), it further held that the IHO properly concluded that the 2010-11 IEP was designed to address AC's individualized needs in the most effective manner possible – for instance, providing for a 1:1 resource consultant and TA to address AC's need for assistance to stay on task and focused, as well as allowing AC to remain in a mainstream setting where he could interact with nondisabled peers – and therefore affirmed the IHO's ruling that the District offered AC a FAPE, (*id.* at 10-13).

The SRO also concurred with the IHO's conclusion that the District offered AC a FAPE for the 2011-12 school year.  After reviewing the recommendations made in the May 2011 IEP, the SRO reasoned that the proposed program effectively reflected and addressed Plaintiffs' concerns regarding their son's anxiety and was tailored to the progress, albeit limited, that AC had made at Eagle Hill during the preceding school year. (*Id.* at 14.)  Concluding that "[t]he hearing record demonstrates that the recommended program with related services was appropriate to address the student's needs as identified in the evaluative information before the CSE and was reasonably calculated to enable him to receive educational benefit in the L[east] R[estrictive] E[nvironment]," the SRO found the parents' claims meritless and affirmed the IHO's decision that the District offered AC a FAPE for the 2011-12 school year. (*Id.* at 16.)

Finally, the SRO reached the same conclusion with respect to the 2012-13 school year. The SRO reviewed hearing testimony concerning AC's 2012 test results, which revealed declining test scores in several key areas, and his level of progress during the most recent school year at Eagle Hill.  (*Id.* at 17.)  This led the District to recommend a BOCES placement at Irvington, which the District believed would offer AC "mainstreaming opportunities with nondisabled peers [along with] appropriate academic and clinical support."  (*Id.* at 18.) Accordingly, the SRO concluded that the record supported the IHO's finding that the recommended Irvington program constituted a FAPE for the 2012-13 school year, and therefore denied the appeal.  (*Id.* at 19.)

Because the SRO concurred with the IHO's determination that the District offered AC a FAPE for the 2010-11, 2011-12 and 2012-13 school years, it also affirmed the IHO's decision not to award tuition reimbursement to Plaintiffs for any of these years.  (*Id.* at 21.)  Additionally, having determined that a FAPE was offered, the SRO declined to reach the issues of whether Eagle Hill constituted an appropriate unilateral placement or whether equitable considerations favored tuition reimbursement.  (*Id.*)[12]

## II.  <u>Discussion</u>

### A.  <u>Summary Judgment Standard for IDEIA and New York Education Law Claims</u>

Motions for summary judgment customarily resolve IDEA actions in federal court.  *See Antonaccio ex rel. Alex v. Bd. of Educ.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003).  Under the IDEA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion.  *Id.*  Rather, summary judgment "is a pragmatic procedural mechanism for reviewing

---

[12] The SRO noted the confusion as to whether the IHO found Plaintiffs' notice deficient for the 2010-11 school year, as suggested by one part of the opinion, (*see* IHO Decision at 102-03), or whether the IHO instead found sufficient notice for all three school years, (*see id.* at 118).  (SRO Decision 21 n.4.)  As a substantive matter, however, the SRO did not reach this issue.

administrative decisions." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (internal quotation marks omitted).  In reviewing an action pursuant to 20 U.S.C. § 1415(i) of the IDEIA, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); *see Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380-81 (2d Cir. 2003).

In deciding the motion, the court's review "requires a more critical appraisal of the agency determination than clear-error review but falls well short of complete *de novo* review." *L.O. ex rel. K.T. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 108 (2d Cir. 2016) (internal quotation marks omitted).  The district court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence, but its review of state administrative decisions is limited.  *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982); *M.H. ex rel. P.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012); *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998).  "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  *Walczak*, 142 F.3d at 129 (alteration and internal quotation marks omitted); *see M.H.*, 685 F.3d at 240.  In many instances, "the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court," but the determination "must also be

15

colored by an acute awareness of institutional competence and role." *M.H.*, 685 F.3d at 244.

Deference to administrative decisions is particularly warranted where the district court's review

"is based entirely on the same evidence as that before the SRO," *id.*, and where the IHO and

SRO decisions are in agreement, *C.W. ex rel. W.W. v. City Sch. Dist. of the City of N.Y.*, 171 F.

Supp. 3d 126, 131-32 (S.D.N.Y. 2016).  Reviewing courts should also be mindful that they are

not to "substitute their own notions of sound educational policy for those of the school

authorities which they review." *Rowley*, 458 U.S. at 206.  Accordingly, "a court must defer to

the SRO's decision on matters requiring educational expertise unless it concludes that the

decision was inadequately reasoned," *R.E. ex rel. M.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167,

189 (2d Cir. 2012), particularly with respect to "determinations regarding the substantive

adequacy of an IEP," *M.H.*, 685 F.3d at 244.

> B.     Provision of a FAPE and Unilateral Placement in Private Schools

The IDEA serves to promote the education of children with disabilities.  *See, e.g.*,

*Walczak*, 142 F.3d at 122 (citing *Rowley*, 458 U.S. at 179).  Under the statute, states that receive

federal funding must provide disabled children with a FAPE, 20 U.S.C. § 1412(a)(1), which

includes "special education and related services" tailored to meet the unique needs of the

particular child, *id.* § 1401(9).

"The 'centerpiece of the statute's education delivery system' is the IEP, an educational

program tailored to provide appropriate educational benefits to individual disabled students."

*Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006) (quoting *Honig v.*

*Doe*, 484 U.S. 305, 311 (1988)).  The IEP must be developed annually by "[a] school official

qualified in special education, the child's teacher, the child's parents, and, where appropriate, the

child." *Walczak*, 142 F.3d at 122.  The IDEIA sets forth procedural and substantive

requirements for IEPs, *see* 20 U.S.C. § 1414, but "does not itself articulate any specific level of educational benefits that must be provided through an IEP," *Walczak*, 142 F.3d at 130.  Courts interpreting the IDEA make clear, however, that a school district is not required to "furnish[] . . . every special service necessary to maximize each handicapped child's potential," *Rowley*, 458 U.S. at 199 (interpreting the Education for All Handicapped Children Act, the predecessor to the IDEA), but rather that a "district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement," *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (internal quotation marks omitted).[13]  Thus, a school district must devise an IEP that is "reasonably calculated to enable the child to receive educational benefits," *Davis v. Wappingers Cent. Sch. Dist.*, 431 F. App'x 12, 14 (2d Cir. 2011) (summary order), but it need not "provide[] everything that might be thought desirable by loving parents," *Walczak*, 142 F.3d at 132 (internal quotation marks omitted).  "Importantly, in order to avoid impermissibly meddling in state educational methodology, we must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan."  *A.M. ex rel. E.H. v. N.Y.C. Dep't of Educ.*, No. 15-CV-4076, 2017 WL 83384, at *12 (2d Cir. Jan. 10, 2017) (alterations and internal quotation marks omitted).

The IDEIA requires that disabled children be educated "[t]o the maximum extent appropriate . . . with children who are not disabled."  20 U.S.C. § 1412(a)(5)(A).  Accordingly, the "services must be provided in the least restrictive setting consistent with a child's needs."  *Walczak*, 142 F.3d at 122.  Indeed, because the IDEA "views private school as a last resort . . .

---

[13] The threshold for whether an IEP is substantively adequate under the IDEA is a question currently before the Supreme Court, *see Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 29 (2016), and as a result it is possible that the applicable standard soon may be different.  For now, however, I apply the well-established law as it currently stands.

[a] child may only be removed into a more restrictive environment when the nature and severity of her disability is such that education in regular classes with the use of supplementary aids and services cannot be satisfactorily achieved." *W.S. ex rel. C.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 148 (S.D.N.Y. 2006). "This is true even if a child with disabilities might make greater academic progress in a more restrictive environment." *Id.*

New York's regulations implementing the goals of the IDEA "appear to track the IDEA closely." *Frank G. v. Board of Educ.*, 459 F.3d 356, 363 (2d Cir. 2006) (quoting *Bd. of Educ. v. O'Shea*, 353 F. Supp. 2d 449, 454 (S.D.N.Y. 2005)); *see* N.Y. Educ. Law §§ 4401-10-b. Parents are entitled to challenge "any matter relating to the identification, evaluation or educational placement of the student or the provision of a free appropriate public education to the student." N.Y. Educ. Law § 4404(1); *see also* 20 U.S.C. § 1415(b)(6)(A) (same). Such challenges must be heard at an impartial due process hearing conducted by the state or local education agency, *see* 20 U.S.C. § 1415(f), and either party may appeal an adverse decision to the appropriate state agency, *see id.* § 1415(g); N.Y. Educ. Law § 4404(2). Once this administrative process is exhausted, a party may file a civil action in federal or state court challenging the administrative decision. *See* 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

"If a state receiving IDEA funding fails to give a disabled child a FAPE . . . , the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state." *O'Shea*, 353 F. Supp. 2d at 454 (internal quotation marks omitted). Parents who seek such reimbursement must satisfy the three-pronged "*Burlington/Carter*" test, which looks to: (1) whether the school district's proposed program will provide a FAPE; (2) whether the parents' private placement is appropriate; and (3) a consideration of the equities. *See generally Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7

(1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985).  To satisfy the first

prong, the school district bears the burden of proving that it timely provided a FAPE to the

student.  N.Y. Educ. Law § 4404(1)(c); *see T.K. ex rel. L.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d

869, 875 (2d Cir. 2016) ("Under New York law, the Department [of Education] bears the burden

of establishing the validity of the IEP . . . .").[14]  The parents have the burden under the second

prong of demonstrating that their unilateral private placement was appropriate.  *See, e.g.*,

*Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007).  Whether a parental

placement is appropriate turns on "whether a placement – public or private – is 'reasonably

calculated to enable the child to receive educational benefits.'"  *Frank G.*, 459 F.3d at 364

(quoting *Rowley*, 458 U.S. at 207).

  C. <u>Whether the District's Placements Were Appropriate</u>

   Plaintiffs argue that the Court should find that the SRO's decision is not entitled to

deference because it failed to render an independent decision based on the hearing record.  (Ps'

Mem. 6.)[15]  Their argument is premised on their assertion that the IHO's "rambling, inconsistent

and haphazard" decision, (Ps' Opp. Mem. 2), was not based on a thorough and careful review of

the record, as evidenced by that decision's typographical and grammatical errors, repetitive

language and conflicting findings, (Ps' Mem. 6).  Plaintiffs are correct that the IHO decision at

---

[14] Defendant in its moving brief initially mischaracterized this burden as falling on Plaintiffs, (D's Mem. 4), which Plaintiffs noted in their opposition brief, (Plaintiffs' Memorandum of Law in Opposition to Defendant's Cross-Motion for Summary Judgment ("Ps' Opp. Mem."), (Doc. 25), 4).  Defendant on reply acknowledged that it bears the burden with respect to showing that its IEPs were appropriate.  (Reply Memorandum of Law in Further Support of Defendant's Cross Motion for Summary Judgment ("D's Reply Mem."), (Doc. 27), 1.)

[15] "Ps' Mem." refers to Plaintiffs' Memorandum of Law in Support of their Motion for Summary Judgment (Doc. 19).

many points appears to be incomplete, sloppily assembled and poorly written.[16]  The apparent

failure to finish, let alone polish, the decision resulted in a document that is not just difficult and

unhelpful, but substantively flawed.  For instance, as noted earlier, the decision appears to reach

two different conclusions as to whether the parents did or did not provide sufficient notice of

their intention to seek reimbursement for AC's attendance at Eagle Hill for the 2010-11 school

year.  An even more egregious example is the IHO's discussion of the propriety of the parents'

private placement for 2012-13, which merely repeats his prior analysis relating to a different

school year.  (*Compare* IHO Decision 114-16, *with id.* at 100, 106-07.)  These are critical

weaknesses that cannot be overlooked, and accordingly the IHO decision does not warrant

deference.

But while Plaintiffs assert that the SRO's decision is "only as good as the underlying

IHO's Decision," (Ps' Mem. 6), I disagree, as does the Second Circuit, *see M.W.*, 725 F.3d at

139 ("Where an SRO has clearly demonstrated a better command of the record and supported

[his] conclusions through better legal and factual analysis than an IHO, we will have little

difficulty deferring to the SRO's opinion."); *see also T.C. ex rel. A.C. v. N.Y.C. Dep't of Educ.*,

No. 15-CV-3477, 2016 WL 1261137, at *8 (S.D.N.Y. Mar. 30, 2016) (although IHO's decision

relied on "incorrect interpretation of the law and the record," SRO's decision nonetheless entitled

to deference because it "was well-reasoned and supported by the record"); *P.G. ex rel. D.G. v.*

*City Sch. Dist.*, No. 14-CV-1207, 2015 WL 787008, at *15 (S.D.N.Y. Feb. 25, 2015) (IHO

decision did not warrant deference "especially when compared to the analytically intensive

opinion rendered by the SRO," and therefore "while the Court . . . undert[ook] its own detailed

---

[16] The document reads as if it were a first draft that was dictated but never reviewed, corrected or completed.  Its first ninety pages are a rambling and often incoherent summary of the hearing testimony, with many paragraphs running five to ten pages.  The analysis is often little more than a recap of the facts and the parties' positions.

review of the record, it appropriately accord[ed] deference to the sound opinion of the SRO").

Based on the evidence in the administrative record – all of which was also presented to the SRO,

*see M.H.*, 685 F.3d at 244 ("[T]he district court should afford more deference [to the SRO's

decision] when its review is based entirely on the same evidence as that before the SRO . . . .") –

I conclude that the SRO's decision deserves deference from this Court.  The SRO's review of the

record was thorough – he appears to have considered all of the evidence submitted by the parties

– and he set forth his decision in a well-reasoned, detailed opinion.  The preponderance of the

evidence, *see* 20 U.S.C. § 1415(i)(2)(C)(iii), supports his conclusions, for the reasons discussed

below.

a)  2010-11 School Year

Plaintiffs argue that the Court should reverse the IHO's decision and the SRO's decision

with respect to the 2010-11 school year for several reasons.  First, they suggest that the objective

evidence before the CSE established that AC failed to make progress during the 2009-10 school

year, and therefore the CSE's decision to recommend much of the same services and support

"guaranteed . . . AC's regression."  (Ps' Mem. 12.)  As an initial matter, it is not clear that AC

regressed as a student during the 2009-10 school year.  Rather, as reflected in the May 4, 2009

IEP, the CSE found that "[AC's] present cognitive abilities and academic levels are meeting both

grade- and age-level expectations," and noted that he had "demonstrated growth in all academic

areas" since the beginning of his first grade year and since the prior CSE evaluation.  (Dist. Ex.

4, at 3.)  Furthermore, as the SRO noted, academic testing and progress reports from AC's

teachers reflected that AC "had achieved or was progressing towards the majority of [2009-10]

annual goals."  (SRO Decision 10.)  Moreover, even if Plaintiffs are correct that AC's struggles

during that year outweighed his growth, they incorrectly assert that the 2010-11 IEP "essentially

offered much of the same services and supports." (Ps' Mem. 12.) Rather, the CSE's proposed

IEP significantly enhanced the services that were offered in the previous IEP. As noted, the

2010-11 IEP increased AC's 1:1 sessions with the resource consultant teacher to five times a

week, rather than two; increased the monthly occupational therapy and speech/language therapy

consultations to sixty minutes, rather than thirty; doubled AC's weekly counseling; and offered

support by a TA on a 1:1 basis, rather than 3:1, for the duration of the school day. (Dist. Ex. 5, at

7.) The CSE further recommended a new hourly consultation on a monthly basis with the

resource consultant teacher. (*Id.*) The SRO therefore reasonably concluded that the CSE's

enhanced IEP, particularly given the multiple one-on-one offerings, made it likely that the

proposed program would yield progress, not regression, which satisfies the District's obligations

under the IDEIA. *Cerra*, 427 F.3d at 195 (internal quotation marks omitted). According due

weight to the SRO's reasoned conclusion regarding the services proposed by the District, I agree

that the 2010-11 IEP provided AC with a FAPE.

Plaintiffs further argue that the SRO improperly relied on retrospective testimony in

determining whether the 2010-11 IEP was appropriate. (Ps' Mem. 13.) In the Second Circuit, an

IEP "must be evaluated prospectively as of the time of its drafting and therefore . . . retrospective

testimony that the school district would have provided additional services beyond those listed in

the IEP may not be considered." *R.E.*, 694 F.3d at 186. The prohibition against retrospective

testimony is intended to reflect the fact that "[a]t the time the parents . . . choose whether to

accept the school district recommendation or to place the child elsewhere, they have only the IEP

to rely on." *Id.* at 186. Therefore, "[i]n determining the adequacy of an IEP, both parties are

limited to discussing the placement and services specified in the written plan and . . . reasonably

known to the parties at the time of the placement decision." *Id.* at 187; *see K.L. ex rel. M.L. v.*

*N.Y.C. Dep't of Educ.*, 530 F. App'x 81, 85 (2d Cir. 2013) ("Restrictions on the use of

retrospective evidence are rooted in the principle that parents must be able to decide rationally

whether to accept a proffered public school placement or to send their child, at the risk of non-

reimbursement, to private school.  In most cases, parents make this difficult decision on the basis

of the IEP.  Accordingly . . . the SRO must assess the IEP from this *ex ante* perspective.").  Thus,

although "testimony that materially alters the written plan is not permitted," because otherwise

"a deficient IEP may . . . be effectively rehabilitated or amended after the fact through testimony

regarding services that do not appear in the IEP," the IHO or SRO may consider testimony "that

explains or justifies the services listed in the IEP."  *R.E.*, 694 F.3d at 185-86.  Accordingly, the

Second Circuit has rejected a "rigid 'four corners' rule prohibiting testimony that goes beyond

the face of the IEP" and instead has adopted a more nuanced approach:

> [I]f an IEP states that a specific teaching method will be used to
> instruct a student, the school district may introduce testimony at
> the subsequent hearing to describe that teaching method and
> explain why it was appropriate for the student. The district,
> however, may not introduce testimony that a different teaching
> method, not mentioned in the IEP, would have been used.
> Similarly, if a student is offered a staffing ratio of 6:1:1, a school
> district may introduce evidence explaining how this structure
> operates and why it is appropriate. It may not introduce evidence
> that modifies this staffing ratio (such as testimony from a teacher
> that he would have provided extensive 1:1 instruction to the
> student).

*Id.* at 186-87.

Plaintiffs argue that the SRO improperly relied on retrospective testimony by Dr. Mor, in

which she stated that the proposed counseling support was sufficient because she would be more

readily available to AC given that her office is close to the third grade classroom.  (Ps' Mem.

14.)  As an initial matter, it is not clear that this testimony qualifies as retrospective.  On the one

hand, the IEP indicates that Dr. Mor would provide psychological counseling twice a week, and

therefore testimony regarding additional "impromptu" counseling throughout the day based on proximity might constitute evidence of a different or supplemental service.  On the other hand, however, Dr. Mor's testimony also contextualizes statements throughout the IEP that refer to her services and role in assisting AC.  (*See, e.g.*, Dist. Ex. 5, at 2 ("The psychologist will work with [AC] to assist him in sharing his concerns and managing his anxiety throughout the school day."); *id.* at 5 ("Counseling services are required to help [AC] learn coping mechanisms and to provide him with a 'safe' space to express his feelings."); *id.* at 6 ("Services will be provided for [AC] throughout the day by the . . . [p]sychologist to give [AC] the support he needs to manage his day at school.")); *see also F.L. v. N.Y.C. Dep't of Educ.*, 553 F. App'x 2, 5 (2d Cir. 2014) (summary order) (testimony not retrospective where it pertained to "*listed* services [that] would be provided," rather than "services *not listed* in the IEP") (emphases in original).  In any event, in this instance I need not determine whether Dr. Mor's testimony was retrospective because there is no indication that the SRO relied on it in making his determination.  Indeed, as Defendant notes, (D's Reply Mem. 2), the SRO recounts Dr. Mor's testimony at length, (SRO Decision 11), but at no point mentions the possibility of additional counseling by way of AC visiting Dr. Mor's office throughout the day.  Because the testimony at issue was not considered in, or at least seems to have been immaterial to, the decisions below, the IHO and SRO decisions cannot be reversed on this basis.

Finally, Plaintiffs contend that the District gave too much weight to keeping AC in a mainstream environment.  (Ps' Mem. 15.)  Given the mandate for the least restrictive environment, *Wolczak*, 142 F.3d at 122, the District's IEP properly provided "mainstreaming" opportunities for AC, in that the CSE determined that AC would continue to experience academic and social growth without having to participate exclusively in special classes or

separate schooling.  (*See* Dist. Ex. 5, at 8; *see also* SRO Decision 13.)  The parents suggest that

AC's access to non-disabled peers would have been meaningless because the services otherwise

offered were inappropriate, (Ps' Mem. 15), but as discussed, the evidence reflected in the record,

which the SRO reviewed and discussed at length, (*see* SRO Decision 10-12), indicates that the

District's IEP was likely to produce progress – at the very least, something more than "mere

trivial advancement," *Cerra*, 427 F.3d at 194 – and was "reasonably calculated" to enable AC to

benefit, *Davis*, 431 F. App'x at 14.

> b) 2011-12 School Year

Plaintiffs argue that the SRO's decision with respect to the 2011-12 school year was also

"fatally flawed."  (Ps' Mem. 18.)  First, they again point to what they identify as discrepancies in

the IHO's decision.  For instance, they note that at one point, the IHO characterized the District's

offerings as "essentially the same" as the prior school year, (IHO Decision 103), but

subsequently wrote that the 2011-12 IEP "provid[ed] more support" than its predecessor, (*id.* at

118).  While Plaintiffs portray the IHO as drawing "differing and conflicting conclusions," (Ps'

Mem. 19), it is not clear that these statements are in as much tension as Plaintiffs suggest.  In any

event, as noted earlier, deference to the SRO is warranted – even where an IHO's analysis is

lacking – where the SRO "has clearly demonstrated . . . command of the record and . . . better

legal and factual analysis than [the] IHO."  *M.W.*, 725 F.3d at 139.  While the SRO certainly took

note of the IHO's findings, the SRO carefully conducted his own review of the hearing record

before, too, concluding that the IEP "was similar to the one recommended for the prior school

year."  (SRO Decision 14.)  Accordingly, because I am satisfied that the SRO conducted an

independent review of the record in reaching his decision, the SRO's findings will not be

disturbed based on arguably conflicting statements by the IHO.  *Compare Bougades v. Pine*

*Plains Cent. Sch. Dist.*, 376 F. App'x 95, 99 (2d Cir. 2010) (summary order) (SRO warranted

deference, even where IHO incorrectly described IEP provisions, because SRO described IEP

correctly and subsequently affirmed adequacy of educational program), *with D.N. ex rel. D.N. v.*

*Bd. of Educ. of Ctr. Moriches Union Free Sch. Dist.*, No. 14-CV-99, 2015 WL 5822226, at *10

(E.D.N.Y. Sept. 28, 2015) (SRO warranted "substantially less deference" because it "merely

repeated the same conclusions – and the same mistakes – from the IHO," which "made

conclusory findings," "misstated the evidence," and found substantively adequate an IEP that

"set forth educational goals . . . yet provided no means of achieving those goals," as evidenced

by fact that the IEP required student to "develop skills involving social interaction with peers,"

but recommended class that "offered no contact with any peers").

      Plaintiffs also argue that the 2011-12 IEP was substantively deficient.  As noted, the

CSE's recommended services for the 2011-12 school year, (Dist. Ex. 6, at 2), matched its

recommendations from 2010-11, (Dist. Ex. 5, at 7).  Where an IEP is "designed without regard

for any . . . progress" made by the student, that IEP is "likely to cause [the student] to regress or

make only trivial advancement," and under such circumstances the student has been denied the

individualized FAPE required by the IDEA.  *E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*,

487 F. App'x 619, 623 (2d Cir. 2012) (summary order).  In *E.S.*, the district court found it

incredible "that after a full year of education, [the student's] needs were identical to those the

CSE found the year before."  *E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d

417, 442 (S.D.N.Y. 2010), *aff'd*, 487 F. App'x 619 (2d Cir. 2012).  But the court in that case

found it "apparent that the CSE simply reprinted the unedited IEP" and "recycl[ed] an old"

recommendation, *id.*, which plainly was not individualized or appropriate.

The same is not true here.  Whereas the court in *E.S.* was "troubled by" the fact that the

annual goals and short-term objectives were "identical" in the two IEPs, suggesting that the

district "never actually evaluated [the student's] academic needs . . . and integrated that

information into a new EIP," *id.*, in this case many of the 2011-12 annual goals were modified or

entirely new, (*compare* Dist. Ex. 6, at 8 (new reading goal of reading a story and answering three

comprehension questions), *with* Dist. Ex. 5, at 8 (old reading goal of listening to a teacher-read

story and answering three comprehension questions); *see also* Dist. Ex. 6, at 9 (new mathematics

goals included adding and subtracting proper fractions with denominators and solving single

digit multiplication problems without use of calculator; new speech/language goals included

greeting at least two children each morning by name)), showing that the IEP was not "designed

without regard for [AC's] progress," *E.S.*, 487 F. App'x at 623.  Further, the record reflects that

services such as occupational therapy were recommended once again, not due to a lack of

attentiveness or care by the CSE, as was the case in *E.S.*, but rather because AC had not received

those services at Eagle Hill and the CSE felt he would benefit from them, (*see* SRO Decision

15), which suggests the CSE actually examined the previous year's services and results, *compare*

*L.O.*, 822 F.3d at 117 (speech/language services "substantially similar" to and carried over from

those contained in previous IEP not adequately designed to address student's needs where

"clear" that student's verbal communications skills were not improving, "IEPs did not call on

[student's] instructors to attempt to work with him on actually improving his speech," and

testimony indicated speech/language services offered at school "were generally applicable to all

students and not narrowly tailored to [student's] particular needs"), *with Omidian v. Bd. of Educ.*

*of New Hartford Cent. Sch. Dist.*, No. 06-CV-1171, 2009 WL 904077, at *24 (N.D.N.Y. Mar.

31, 2009) (although IEP contained same goals and objectives as prior version, SRO found IEP

adequate because those goals and objectives were "expanded and clarified," and although

plaintiffs argued IEP should have contained goals related to certain of student's specific needs,

omission insufficient to render IEP substantively inadequate, in part because "the sufficiency of

goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires

deference to the expertise of the administrative officers") (internal quotation marks omitted).

   Further, as the SRO noted, (SRO Decision 14), Dr. Mor testified that goals were adjusted

where AC had made progress, but that many remained the same because AC had not mastered

them at Eagle Hill, which is located in Connecticut and does not follow the New York State

curriculum.  (Tr. 249, 251, 254, 269.)  If a student made no progress under a particular IEP,

using an identical IEP the following year would be questionable.  *See Schroll v. Bd. of Educ.*,

No. 06-CV-2200, 2007 WL 2681207, at *5 (C.D. Ill. Aug. 10, 2007).  An IEP is not

inappropriate, however, "simply because it does not change significantly on an annual basis."  *Id*.

> To the extent there is some similarity between goals from year to
> year, such continuity makes sense.  Modeling an IEP after the prior
> year's IEP, with appropriate changes, is a sensible practice that, as
> long as it is not done reflexively and without consideration of the
> student's individual circumstances and needs, does not signify that
> the student is likely to regress.  *See M.H.*, 685 F.3d at 256 (no
> procedural violation even where IEP's goals were photocopied
> from prior year's IEP when goals "remained appropriate").

*J.C.S. ex rel. J.S. v. Blind Brook-Rye Union Free Sch. Dist.*, No. 12-CV-2896 CS, 2013 WL

3975942, at *12 (S.D.N.Y. Aug. 5, 2013).

   In sum, the CSE considered ample evidence, including evaluation reports relating to

AC's speech/language, motor skills and academic progress, numerous test results, and input from

those knowledgeable with Eagle Hill's offerings, (*see* Dist. Ex. 6), to create an appropriate IEP.

The evaluative materials presented to the CSE did not identify any services so necessary that

their omission from the resulting IEP denied AC a FAPE.  *See A.M.*, 2017 WL 83384, at *14-16

(where "reports and evaluative materials present at the CSE meeting yield a clear consensus, an IEP formulated for the child that fails to provide services consistent with that consensus is not reasonably calculated to enable the child to receive educational benefits," and consensus established where witnesses familiar with child, as well as reports, "specifically recommend" and find it "imperative" and "necessary" that particular therapies be used, and where no evaluative materials suggest otherwise or call recommendations into question) (internal quotation marks omitted); *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 81 (2d Cir. 2014) (IEP's failure to consider 1:1 classroom ratio denied student FAPE because "all witnesses familiar with [student] testified that he required a 1:1 placement" and no witnesses countered "overwhelming testimony that 1:1 instruction was necessary").  Indeed, in this instance it seems that the CSE incorporated all of the services touted by those who appeared before it.  The SRO reviewed this evidence in detail and determined that it supported the CSE's May 2011 recommendation. Where a student's needs and objectives remain substantially the same, "[i]t is especially sensible that [an IEP] would reflect continuity with [a student's] needs and objectives as of [previous years,]" *L.B. ex rel. J.B. v. N.Y.C. Dep't of Educ.*, No. 15-CV-3176, 2016 WL 5404654, at *11 (S.D.N.Y. Sept. 27, 2016), and here that proved to be the case.  Accordingly, the SRO appropriately found that the 2011-12 IEP was not inadequate on this basis.[17]

Plaintiffs further argue that the SRO "wholly ignored [Defendant's] bad faith" offer to consider out-of-district placements after the CSE had already met and issued recommendations for the upcoming school year.  (Ps' Mem. 21.)  The SRO did not ignore Dr. Mor's and Ms.

---

[17] Plaintiffs in their opposition brief, (Ps' Opp. Mem. 11-12), suggest that Defendant is attempting to confuse the issues relating to the 2011-12 IEP by discussing AC's re-evaluation testing from January 2012, which Defendant uses to highlight decreases in AC's performance, (D's Mem. 12).  Whether or not this was Defendant's intent, it is clear that testing conducted subsequent to the CSE's meeting on May 13, 2011 could not have informed the recommendations made for the 2011-12 school year, and therefore does not affect my review of those recommendations.

Klein's facilitation of KC's visit to the BOCES program at Pocantico Hills – he discussed it at

some length, (SRO Decision 15) – but he did not find it particularly relevant to whether the

recommended Midland program offered a FAPE.  Plaintiffs contend that this offer "significantly

impeded [their] right to meaningfully participate in the CSE Process" because it led them

reasonably to believe that the Midland program was not appropriate, and that the District shared

that view.  (Ps' Opp. Mem. 11.)  There is no basis, however, to assert that the District's position

regarding the appropriateness of a Midland placement for the 2010-11 school year was unclear.

Indeed, the CSE at its annual review meeting on May 13, 2011 made its recommendation and set

forth the services AC would receive if the parents chose to forgo an alternative placement and

enroll AC at Midland.  It was the parents who rejected the Midland recommendation.  (Tr. 2230,

2430.)  That school officials (Mor and Klein) later were willing to accommodate Plaintiffs'

interests in exploring out-of-district programs by arranging a visit to Pocantico Hills would not

constitute sufficient reason to doubt the certainty of the CSE's recommendation – at least to a

degree such that the SRO should have concluded, or that I should now conclude, that Plaintiffs

were denied a right to meaningfully participate in the CSE process.  To the contrary, the parents

spoke at length during the CSE meeting at which the IEP was developed.  (*See* Dist. Ex. 6, at 2.)

Further, the parents declined to pursue the Pocantico program, and thus were entirely clear that

their choices were the in-District placement or privately educating AC elsewhere.  While Dr.

Mor's and KC's visit to Pocantico Hills appears to be unusual absent or in lieu of a formal

request to place AC, and while certain of Plaintiffs' exhibits suggest, at the least, that the

BOCES supervisor misunderstood the purpose behind the visit, there is no basis to find that the

visit suggested that either Dr. Mor or Klein concurred with the parents that the CSE's

recommendation of Midland would deny AC a FAPE, such that a procedural violation of the

IDEIA "significantly imped[ing] [Plaintiffs'] opportunity to participate in the decisionmaking

process, or cau[sing] a deprivation of educational benefits" occurred.  *D.A.B. v. N.Y.C. Dep't of*

*Educ.*, 973 F. Supp. 2d 344, 359 (S.D.N.Y. 2013) (internal quotation marks omitted).

c)  2012-13 School Year

Turning to the 2012-13 school year, Plaintiffs again argue that the IHO and SRO relied

on retrospective testimony by Defendant's witnesses.  The parents contend that statements by

Irvington's school psychologist regarding the number of students in the recommended class, as

well as their verbal skills, social profile, and age range, constituted retrospective testimony that

neither administrative officer should have considered.  (Ps' Mem. 22.)  In this instance, the CSE

recommended the Irvington program on July 12, 2012, after KC had previously requested and

received the class profile, (Dist. Ex. 8, at 2), which contained information regarding the four

students in the class, including their disabilities, ages, IQs and academic levels, (*see* Dist. Ex.

38).  Therefore, the characteristics of the Irvington program were known to both parties at the

time.  Accordingly, unlike the example articulated in *R.E.* – where, for instance, parents make a

decision based on an IEP stating that a student will be offered a 6:1:1 staffing ratio, but later

testimony indicates that the teacher in fact would have provided 1:1 instruction, *see* 694 F.3d at

186-87 – here the parents were aware of what services the IEP offered, and in what specific

context, before making their decision.  Accordingly, the few additional details in the

psychologist's testimony did not "materially alter[] the written plan," *id.* at 186, or prevent the

parents from making an informed decision, *see K.L.*, 530 F. App'x at 85, but rather "explain[ed]

or justif[ied] the IEP, *R.E.*, 694 F.3d at 185, and were not an improper basis for consideration by

the SRO.  *Compare F.L.*, 553 F. App'x at 6 (testimony not retrospective, in part, because it did

"not contradict anything told to the parents before the placement decision"), *with J.W. ex rel.*

*Jake W. v. N.Y.C. Dep't of Educ.*, 95 F. Supp. 3d 592, 605 (S.D.N.Y. 2015) (testimony at

impartial hearing that student was in specific teacher's class retrospective because "[t]here [was]

no evidence . . . that the [p]arents knew when they rejected the placement that [the student]

would have been in [that] class").[18]

---

[18] Even if the testimony regarding the class by the Irvington school psychologist were excluded, the programming described in the IEP suggests that AC was offered a reasonable opportunity at academic and social progress. *See K.L.*, 530 F. App'x at 85 ("The question . . . is not whether the SRO relied on impermissible retrospective evidence, but whether sufficient *permissible* evidence, relied on by the SRO, supports the SRO's conclusion that the IEP offered K.L. a reasonable prospect of educational benefits.") (emphasis in original). There is no evidence in the record, for instance, that AC required a 4:1 ratio to be successful and could not have progressed in a classroom with up to eleven other students (such that the only reason Irvington was deemed appropriate was the fact that only four children were actually in the class). Indeed, the 2012-13 IEP recommended weekly and monthly occupational therapy, weekly and monthly speech/language therapy, and weekly counseling in an individual and group setting, (Dist. Ex. 8, at 2), which were all services that the CSE had identified as critical to AC's social, academic and physical progress based on its evaluation of his development to date, (*see generally* Dist. Ex. 7). The SRO further reviewed testimony that Eagle Hill did not provide AC with any occupational therapy or access to nondisabled peers, which would be remedied by participation in the Irvington program. (SRO Decision 17.) Accordingly, even independent of the class profile that the parents requested and reviewed prior to making their decision, I cannot say that there was insufficient permissible evidence, relied on and considered by the SRO, to support the conclusion that the Irvington program represented a reasonable response to AC's development to date and that the District offered AC a FAPE for the 2012-13 school year.

Plaintiffs in the alternative argue that the SRO should be reversed because AC did not fit the profile of the other students in the class, and therefore the District's placement was inappropriate on substantive grounds. (Ps' Mem. 23.) They highlight, for instance, the IQs and ages of AC's potential classmates. (*Id.* at 23-24; *see* Dist. Ex. 38, at 2.) Plaintiffs argue that the SRO should have disregarded testimony about the class as retrospective – even though in sum and substance it reflected facts available to the parents in the class profile – but also suggest that the SRO should have relied on such testimony to find that the District's IEP was an inappropriate fit. In any event, the SRO reviewed the parents' objections based on the profile, (SRO Decision 17-18), as well as testimony from the District's witnesses as to why this classroom setting was appropriate, (*id.* at 18-19). Those witnesses testified, for example, that many of AC's and the other students' characteristics and behaviors manifest themselves across different classifications (at least one of which was "Other Health Impaired," a classification previously applied to AC); that special education settings often include students in multiple grades spanning an age range of up to three years; and that AC's lower IQ masked his cognitive abilities, he was highly verbal, and he would benefit by interacting with higher functioning students. (*Id.*) Weighing the parents' and the District's statements and supporting documentation, the SRO reasonably found that the services and setting of the Irvington program were appropriate, and that AC was offered a FAPE, notwithstanding differences among the students' profiles. (*Id.* at 17-19.) I agree with, and defer to, the SRO's approach.

Finally, to the extent Plaintiffs question the appropriateness of the Irvington program on the basis that the psychologist's workload would have made it difficult for her to provide the promised services, (Ps' Opp. Mem. 14-15), "it is speculative to conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates," *M.O. ex rel. D.O. v. N.Y.C. Dep't of Educ.* 793 F.3d 236, 244 (2d Cir. 2015) (citing *R.E.*, 694 F.3d at 195); *see M.T. ex rel. H.T. v. N.Y.C. Dep't of Educ.*, No. 14-CV-10124, 2016 WL 1267794, at *11 (S.D.N.Y. Mar. 29, 2016) (only "narrow category of prospective challenges to a proposed placement school's capacity" survive *M.O.* – namely, "cases in which the placement school cannot implement the IEP") (internal quotation marks omitted). Unlike parents challenging an IEP recommending a seafood-free environment at a school that was not seafood-free, or an IEP recommending one-on-one occupational therapy outside of the classroom at a school that provides only in-class occupational therapy in a group setting – both of which the Second Circuit has

Plaintiffs further argue that the SRO should not have considered the speech/language and counseling goals that were omitted from the May 21, 2012 and July 12, 2012 IEPs.  (Ps' Mem. 23.)  The District's witnesses testified that the omission was a technical error, (Tr. 1463); that these goals were discussed at the May 21, 2012 meeting, as evidenced by the fact that "[b]ased on . . . the goals discussed" at that meeting, the CSE recommended, among other things, speech/language therapy and counseling services, (Dist. Ex. 7, at 3); and that KC attended that meeting, (*id.* at 1).  But the District's witnesses also acknowledged that the CSE did not review these goals in July, because that meeting focused exclusively on whether Irvington would be appropriate for AC, (Tr. 2726), nor did the District provide to the parents a written IEP containing speech/language and counseling goals until October 12, 2012, (*id.* at 1466, 1481; *see* Dist. Ex. 49, at 25).  The IHO noted the parents' argument that the 2012-13 IEP failed to specify speech/language and counseling goals until October 2012, but otherwise did not focus on this issue.  (IHO Decision 111.)  The SRO did the same.  (SRO Decision 4, 17.)  Both the IHO and SRO incorrectly failed to identify the District's omission of these goals from the initial IEPs as a procedural violation.

But procedural violations of the IDEIA "only entitle a parent to reimbursement if they . . . significantly impeded the parents' opportunity to participate in the decisionmaking process." *D.A.B.*, 973 F. Supp. 2d at 359 (internal quotation marks omitted).  "[N]ot every procedural error will render an IEP legally inadequate."  *M.H.*, 685 F.3d at 245.  In this instance, the SRO cited

---

distinguished as not speculative, *M.O.*, 793 F.3d at 244 (citing cases) – the IEP in this instance recommended weekly group and individual psychological counseling, (Dist. Ex. 8, at 2), and the record reflects no indication that these services, unlike the examples illustrated, were categorically impossible to provide, *see M.T.*, 2016 WL 1267794, at *11 (challenges to placement's capacity to carry out IEP permitted only for "concrete impossibilities").  Furthermore, Plaintiffs' argument is based exclusively on the psychologist's testimony at the IHO hearing, (Ps' Opp. Mem. 14), but "this test of a school's capacity to implement a student's IEP is limited to facts uncovered by a parent *prior to* rejecting the placement option. . . .  It does not permit litigants to establish a substantive violation based on facts discovered for the first time at an IHO hearing," *M.T.*, 2016 WL 1267794, at 12 (internal quotation marks omitted).  Accordingly, I decline to reverse the SRO on this basis.

the uncontradicted testimony by the District's witnesses that these specific goals were discussed as part of the May 21, 2012 meeting, (SRO Decision 17) – an assertion supported by the fact that the IEP notes indicate that speech/language services were proposed immediately after AC's goals were discussed.  Further, there is no dispute that the IEP, despite omitting these goals, nonetheless contained speech/language and counseling services that the parties understood would be implemented.  During the July 12, 2012 CSE meeting, the parents made no mention of the fact that the IEP developed at the May 21, 2012 meeting had left out these goals, further suggesting that the omission did not interfere with or otherwise affect their decision to place AC at Eagle Hill.[19]  Accordingly, although both the IHO and SRO should have done more than just mention the omitted goals, there was never any indication in 2012 that the speech/language and counseling services discussed by the CSE would be stripped from the proposed programming. *See M.M. ex rel. J.S. v. N.Y.C. Dep't of Educ.*, 655 F. App'x 868, 871 (2d Cir. 2016) (summary order) (even assuming IEP's failure to specify classroom location and nature of classroom sessions constituted procedural defect, omission neither impeded student's right to FAPE nor resulted in IEP that significantly impeded parent's opportunity to participate in decisionmaking process, in part due to extent of parent's "engagement with the IEP process," as evidenced by fact that parent "was involved in important junctures in development of [the] IEP," including participating in meeting at which IEP was prepared) (alteration in original) (internal quotation marks omitted); *L.O.*, 822 F.3d at 121-22 (procedural violation occurred when IEP omitted goals related to student's physical and occupational therapy needs, and failed to indicate frequency with which student's progress in reaching goals would be reported during school year, but

---

[19] It appears that the parents received the May 2012 IEP around July 2, 2012, in advance of the July 12, 2012 CSE meeting.  (*See* Ps' Ex. 20, at 6.)

student not deprived of FAPE because student still slated to receive weekly and individual

therapy services under terms of IEP).  Nor was the District attempting to "amend/fix the services

listed in the IEP by showing that AC would, in practice, have received the missing

speech/language services," as Plaintiffs suggest, (Ps' Opp. Mem. 13), given that only the goals,

but never the services, were omitted.

Accordingly, despite the procedural violation, the SRO appropriately found that the

District offered AC a FAPE for the 2012-13 school year.

***

I recognize and understand Plaintiffs' desire to obtain the best possible education for AC,

as well as their dissatisfaction with the outcome of the placement process.  But the law does not

require the District to place AC in the best possible environment – it merely requires the District

to make a recommendation that is reasonably calculated to enable AC to receive educational

benefits in the least restrictive environment.  *See Gagliardo*, 489 F.3d at 112.  The issue is not

whether Eagle Hill could meet AC's needs better than Midland or Irvington.  Rather, it is

whether there exist adequate grounds for me to overrule the IHO's and SRO's judgments that the

District's IEPs recommending the latter programs offered AC a FAPE.  I find that there are not.

The IHO's decision was carelessly assembled and poorly written, but at the same time, I cannot

dismiss as unreasoned or unworthy of deference the SRO's assessment that the mainstreaming

opportunities, occupational therapy and 1:1 support services at Midland, or the benefits of the

gifted program at Irvington, including therapy, counseling and exposure to other, higher-

functioning students with disabilities, made those schools appropriate placements.  While there is

evidence that AC benefited in certain respects from attendance at Eagle Hill, it does not render

Midland or Irvington inappropriate placements.

35

Because I find that Midland was an appropriate recommendation for the 2010-11 and 2011-12 school years, and that Irvington was an appropriate recommendation for the 2012-13 school year, I need not address whether the parents' unilateral placement at Eagle Hill was appropriate or whether equitable considerations would warrant reimbursement. My review of the record, with due deference to the SRO's findings, show that the District fulfilled its responsibility.

For the reasons stated above, Defendant's Cross-Motion for Summary Judgment is granted with regard to Plaintiffs' IDEIA and New York Education Law claims,[20] and Plaintiffs' Motion for Summary Judgment is denied with regard to those claims.

---

[20] Article 89 of the New York Education Law sets forth regulations and administrative procedures that implement the goals of the IDEA and "track the IDEA closely." *Frank G.*, 459 F.3d at 363 (internal quotation marks omitted); *see LV v. N.Y.C. Dep't of Educ.*, No. 03-CV-9917, 2005 WL 2298173, at *1 & n.1 (S.D.N.Y. Sept. 20, 2005). Because Plaintiffs do not make allegations or offer evidence or arguments outside of the IDEA context to show that Defendant violated New York law specifically, *see, e.g.*, *D.J. ex rel. G.J. v. N.Y.C. Dep't of Educ.*, No. 12-CV-7009, 2013 WL 4400689, at *5 (S.D.N.Y. Aug. 15, 2013) (examining allegations that CSE violated specific New York regulations); *Danielle G. v. N.Y.C. Dep't of Educ.*, No. 06-CV-2152, 2008 WL 3286579, at *8-14 (E.D.N.Y. Aug. 7, 2008) (same), and because both sides seem to agree that the Education Law and IDEIA claims rise or fall together, summary judgment in favor of Defendant on the Article 89 claim, along with the IDEIA claim, is appropriate. *See Z.A. ex rel. D.A. v. N.Y.C. Dep't of Educ.*, No. 15-CV-1539, 2016 WL 4766340 (S.D.N.Y. Sept. 13, 2016); *M.C. ex rel. W.C. v. Lake George Cent. Sch. Dist.*, No. 10-CV-1068, 2012 WL 3886159 (N.D.N.Y. Sept. 6, 2012).

### III.    Conclusion

For the reasons stated above, Plaintiffs' Motion for Summary Judgment is DENIED, and

Defendant's Cross-Motion for Summary Judgment is GRANTED.  The Clerk of Court is

respectfully directed to terminate the pending Motions, (Docs. 18, 20), enter judgment for the

Defendant, and close the case.

**SO ORDERED.**

Dated:  February 7, 2017
White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.